## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| FALEN GHEREBI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1164  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, | ) | |
| and ROBERT M. GATES, | ) | |
| Secretary of Defense, | ) | |
| | ) | |
| Respondents. | ) | |
| _____) | | |
| | ) | |
| TAJ MOHAMMAD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-879  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| _____) | | |
| | ) | |
| KARIN BOSTAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-883  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| _____) | | |

|  |  |  |
|---|---|---|
| NASRULLAH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-891  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, <u>et al.</u>, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| ASIM BEN THABIT AL-KHALAQI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-999  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, <u>et al.</u>, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| MOHAMMED AMON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1493  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, <u>et al.</u>, | ) | |
| | ) | |
| Respondents. | ) | |

_____  )
                                 )
ABDULLAH M. AL-SOPAI             )
ex rel. ABDALHADI M. AL-SOPAI,   )
                                 )
               Petitioner,       )
                                 )
        v.                       )        Civil Action No. 05-1667  (RBW)
                                 )
BARACK H. OBAMA,                 )
President of the United States, et al., )
                                 )
               Respondents.      )
_____  )
                                 )
KADEER KHANDAN,                  )
                                 )
               Petitioner,       )
                                 )
        v.                       )        Civil Action No. 05-1697  (RBW)
                                 )
BARACK H. OBAMA,                 )
President of the United States, et al., )
                                 )
               Respondents.      )
_____  )
                                 )
ISSAM HAMID ALI BIN ALI AL JAYFI, )
et al.,                          )
                                 )
               Petitioners,      )
                                 )
        v.                       )        Civil Action No. 05-2104  (RBW)
                                 )
BARACK H. OBAMA,                 )
President of the United States, et al., )
                                 )
               Respondents.      )
_____  )

| | | |
|---|---|---|
| SHARAF AL SANANI, <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2386  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| WASIM and QAYED, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1675  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| RABIA KHAN <u>ex</u> <u>rel.</u> MAJID KHAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1690  (RBW) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| President of the United States, <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Respondents. | ) | |

```
_____      )
MUHAMMAD MUHAMMAD SALEH                 )
NASSER ex rel. ABDULRAHMAN              )
MUHAMMAD SALEH NASSER,                  )
                                        )
                Petitioner,             )
                                        )
        v.                              )        Civil Action No. 07-1710  (RBW)
                                        )
BARACK H. OBAMA,                        )
President of the United States, et al., )
                                        )
                Respondents.            )
_____)
                                        )
ABDUL RAHMAN UMIR AL QYATI              )
and SAAD MASIR MUKBL AL AZANI,          )
                                        )
                Petitioner,             )
                                        )
        v.                              )        Civil Action No. 08-2019  (RBW)
                                        )
BARACK H. OBAMA,                        )
President of the United States, et al., )
                                        )
                Respondents.            )
_____)
```

## MEMORANDUM OPINION

The petitioners in the cases captioned above are detainees at the Guantanamo Bay Naval

Base in Guantánamo Bay, Cuba.  They challenge the legality of their confinement by the

government,[1] seeking the issuance of writs of habeas corpus to secure their release from

detention.  Remarkably, despite the years that have passed since these habeas corpus petitions

---

[1]  In addition to the President, who is named as a respondent in his official capacity in each of these cases, many of the petitioners name various government officials as additional respondents in their habeas corpus petitions.  A motion is currently pending before Judge Thomas F. Hogan of this Court to clarify that the Secretary of Defense is the only proper respondent in these cases.  Because Judge Hogan has not yet resolved that motion, and for ease of reference, the Court refers to the respondents collectively as the "government" for purposes of this memorandum opinion.

were filed, the state of the law regarding the scope of the President's authority to detain the petitioners remains unsettled.  Bereft of any definitive guidance from the Supreme Court or the Court of Appeals for this Circuit on this point of law, the Court must attempt to ascertain for itself whether the President has the authority to detain individuals as part of its ongoing military campaign against the terrorist organization known as al-Qaeda and, if so, what is the scope of that authority.  This memorandum opinion represents the Court's attempt to answer those threshold legal questions.[2]

## I. Background

On September 11, 2001, nineteen individuals affiliated with the Sunni extremist movement known as al-Qaeda hijacked four commercial passenger jet airliners in a coordinated terrorist attack against this country.  The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States 4 (W.W. Norton & Co., Inc.).  Two of the airliners were flown into the World Trade Center in New York City, id. at 4-8; a third crashed into the Pentagon in Arlington, Virginia, id. at 8-10.  The fourth airliner, United Airlines Flight 93, crashed into an empty field near Shanksville, Pennsylvania, after passengers aboard

---

[2]  In preparing this memorandum opinion, the Court considered the following documents submitted or incorporated by reference by the parties: (1) Petitioners' Memorandum of Law Concerning the Appropriate Definition of "Enemy Combatant" filed by Mohammed Ahmed Saeed Hidar a/k/a Mohammed Ahmed Said Haidel (ISN 498) in al Sanani v. Obama, Civil Action No. 05-2386 (RBW) (D.D.C.) (the "Pet'rs' Mem."), (2) Petitioner's Memorandum of Law Defining "Enemy Combatant" filed in al Sattar v. Obama, Civil Action No. 08-1236 (JDB) (D.D.C.), (3) Petitioner's Motion for Expedited Judgment submitted by Umar Abdalayev (ISN 257) in al Sanani v. Obama, Civil Action No. 05-2386 (RBW) (D.D.C.), (4) Petitioner's Memorandum of Law Concerning the Appropriate Definition of "Enemy Combatant" filed in al-Adahi v. Obama, Civil Action No. 05-280 (GKK) (D.D.C.) , (5) Petitioner's Motion for Expedited Judgment on the Record filed by Jamil Ahmed Saeed Nassir (ISN 728) in al Sanani v. Obama, Civil Action No. 05-2386 (RBW) (D.D.C.), (6) Respondents' Memorandum in Opposition to Petitioners' Motions for Expedited Judgment on the Record (the "Gov't's Opp'n"), (7) Respondents' Memorandum Regarding the Government's Detention Authority Relative to Detainees at Guantanamo Bay (the "Gov't's Mem."), (8) Majid Khan's Supplemental Memorandum Regarding the Government's Detention Authority (the "Khan Mem."), (9) Respondents' Reply to Majid Khan's Supplemental Memorandum Regarding the Government's Detention Authority (the "Gov't's Reply"), and (10) Petitioners' Joint Memorandum in Reply to Respondents' Memorandum of March 13, 2009 (the "Pet'rs' Reply").  The Court has also consulted numerous treatises, commentaries, and articles on this subject, many of which are cited herein.

the flight attempted to commandeer the plane.  Id. at 10-14.  Exactly one week later, Congress

passed a joint resolution authorizing the President to "use all necessary and appropriate force

against those nations, organizations, or persons he determines planned, authorized, committed, or

aided" those attacks "to prevent any future acts of international terrorism against the United

States by such nations, organizations[,] or persons."  Authorization for Use of Military Force (the

"AUMF"), Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001).

Pursuant to this authorization of force, Operation Enduring Freedom, a collaborative

military operation conducted by a coalition of nations principally consisting of troops from the

United States and the United Kingdom, commenced on October 7, 2001.  GlobalSecurity.org,

Text: President Bush Announces Military Strikes in Afghanistan (Oct. 7, 2001),

http://www.globalsecurity.org/military/library/news/2001/10/mil-011007-usia01.htm.  The stated

purpose of this operation "included the destruction of terrorist training camps and infrastructure

within Afghanistan, the capture of al Qaeda leaders, and the cessation of terrorist activities in

Afghanistan."  Christopher B. Hynes et al., National Security, 41 Int'l Law. 683, 685 (2007).

Working with the United Islamic Front for the Salvation of Afghanistan, also known as the

"Northern Alliance," coalition forces succeeded in removing from power the Taliban regime and

installing a democratic form of government in Afghanistan in 2004.  However, remnants of the

Taliban regime still wield influence in many regions of Afghanistan and neighboring Pakistan,

Osama bin Laden and other al-Qaeda leaders remain at large, and al-Qaeda continues to operate

today, albeit with a diminished capacity.  See Michael Chertoff, Tools Against Terror: All of the

Above, 32 Harv. J.L. & Pub. Pol'y 219, 219-21 (2009) (concluding that "al Qaeda no longer has

a state sponsor" and "neither owns nor has free reign over an entire country anymore," and that

"[m]uch of its original leadership has been brought to justice in one way or another").

Consequently, Operation Enduring Freedom remains in effect some seven-and-a-half years after it was first initiated.

The scope of the detention authority claimed by the President in the armed conflict authorized by the AUMF began to take shape within months of the passing of the joint resolution.  On November 13, 2001, President Bush issued a Military Order entitled Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001).  In that order, the President, citing both the AUMF and "the authority vested in [him] as . . . Commander[-]in[-]Chief of the Armed Forces" pursuant to Article II of the Constitution, concluded that it was "necessary for individuals subject to this order . . . to be detained, and, when tried, to be tried for violations of the laws of war and other applicable laws by military tribunals."  Id.  President Bush defined the term "individual subject to this order" to mean any non-United States citizen for whom there was "reason to believe" that he (1) was a present or past member of al-Qaeda, (2) had "engaged in, aided or abetted, or conspired to commit[] acts of international terrorism, or acts in preparation therefor" that "caused, threaten[ed] to cause, or ha[d] as their aim to cause[] injury to or adverse effects on" the United States, its citizens, "national security, foreign policy, or the economy," or (3) "knowingly harbored" such an individual, provided that detention was "in the interest of the United States." Id. at 57,834.  The President also delegated authority to the Secretary of Defense to detain and try individuals subject to the order.  Id. at 57,834-57,835.

Individuals detained by President Bush's Military Order were subsequently labeled "enemy combatants" by the Department of Defense, harkening back to a phrase used by the Supreme Court in a World War II-era case known as Ex parte Quirin, 317 U.S. 1 (1942).  Louis Fisher, Military Tribunals and Presidential Power 220-22 (Univ. Press of Kan. 2005).  On

November 26, 2002, the General Counsel for the Department of Defense, William J. Haynes, II, defined an enemy combatant as "'an individual who, under the laws and customs of war, may be detained for the duration of an armed conflict.'"  Id. at 221 (quoting Letter from William J. Haynes II, General Counsel, Department of Defense, to Senator Carl Levin (Nov. 26, 2002) (the "Haynes Letter") at 1-2).  Haynes further noted the "'consistency'" of the Department of Defense's practices with the following language from Quirin: "'"Citizens who associate themselves with the military arm of the enemy government, and[,] with its aid, guidance[,] and direction enter this country bent on hostile acts are enemy belligerents within the meaning of the Hague Convention and the law of war."'"  Id. at 222 (quoting Haynes Letter at 1-2 (quoting Quirin, 317 U.S. at 37-38)).

These wide-ranging assertions of detention authority by the executive branch were tested for the first time in Hamdi v. Rumsfeld, 542 U.S. 507 (2004), where the Supreme Court considered whether the "necessary and appropriate force" authorized by the AUMF and the President's inherent authority as Commander-in-Chief of the Armed Forces under Article II of the Constitution permitted the President to detain an American citizen alleged to have taken up arms against the United States on behalf of the Taliban.  "Born in Louisiana in 1980," Yaser Esam Hamdi "moved with his family to Saudi Arabia as a child," then migrated to Afghanistan by 2001. Id. at 510.  "At some point that year, he was seized by members of the Northern Alliance, . . . and eventually was turned over to the United States military." Id.  The United States designated Hamdi as an "enemy combatant" subject to indefinite detention "without formal charges or proceedings." Id.

In June of 2002, Hamdi's father filed a habeas corpus petition on Hamdi's behalf in the United States District Court for the Eastern District of Virginia, "contend[ing] that Hamdi's

detention was not legally authorized" and requesting, <u>inter alia</u>, the appointment of counsel, an

order barring the government from further interrogating Hamdi, a declaration that the

government's conduct violated Hamdi's Fifth and Fourteenth Amendment rights as an American

citizen, an evidentiary hearing to resolve any disputes Hamdi might have with the material

factual allegations made against him, and release from custody.  <u>Id.</u> at 511.  After the Fourth

Circuit reversed the district court's order appointing an attorney for Hamdi and ordering that the

attorney be given access to Hamdi, the government moved to dismiss Hamdi's petition on the

grounds that he was an "enemy combatant."  <u>Id.</u> at 512.  The district court denied this motion, <u>id.</u>

at 513, but the Fourth Circuit reversed the district court again, finding that the evidence adduced

by the government—a single declaration from the Special Advisor to the Under Secretary of

Defense for Policy—"provided a sufficient basis upon which to conclude that the President had

constitutionally detained Hamdi pursuant to the President's war powers."  <u>Id.</u> at 514.  "On the

more global question of whether legal authorization exist[ed] for the detention of citizen enemy

combatants at all, the Fourth Circuit rejected Hamdi's arguments that . . . any such detentions

[were] unlawful," finding authorization for his detention in the AUMF.  <u>Id.</u> at 515.

On writ of <u>certiorari</u> to the Supreme Court, the Court considered "[t]he threshold

question . . . whether the Executive has the authority to detain citizens who qualify as 'enemy

combatants.'"  <u>Id.</u> at 516 (plurality opinion).  Noting "some debate as to the proper scope of this

term," the Court defined the term "for purposes of th[e] case" as meaning "an individual

who . . . was part of or supporting forces hostile to the United States or coalition partners in

Afghanistan <u>and who engaged in an armed conflict against the United States there</u>."  <u>Id.</u> (internal

citation and quotation marks omitted) (emphasis added).  The Court then proceeded to inquire

"whether the detention of citizens falling within that definition [was] authorized."  <u>Id.</u>

A plurality of the Court answered the latter question in the affirmative, concluding "that Congress ha[d] in fact authorized Hamdi's detention[] through the AUMF." Id. at 517. After rejecting Hamdi's argument that his detention was forbidden by 18 U.S.C. § 4001(a), id., the plurality reasoned that "[t]here [could] be no doubt that individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al[-]Qaeda terrorist network responsible for those attacks, [were] individuals Congress sought to target in passing the AUMF," id. at 518. Specifically, the plurality found that "detention of individuals falling into the limited category" before it; i.e., an individual in Hamdi's particular situation, was "so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress ha[d] authorized the President to use." Id. The plurality therefore concluded that "[t]he United States may detain, for the duration of these hostilities, individuals legitimately determined to be Taliban combatants who 'engaged in an armed conflict against the United States'" because, assuming that the "the record establishe[d] that United States troops [were] still involved in active combat in Afghanistan, those detentions [would be] part of the exercise of 'necessary and appropriate force,' and therefore [would be] authorized by the AUMF." Id. at 521.

Having determined that the President could potentially detain "enemy combatants," the plurality turned to "the question of what process is constitutionally due to a citizen who disputes his enemy-combatant status." Id. at 524. The plurality rejected the notion that such a determination could be made "purely as a matter of law, with no further hearing or factfinding necessary," id. at 526, choosing instead to apply the balancing test adopted in Mathews v. Eldridge, 424 U.S. 319 (1976), to determine the extent of the process to be afforded to citizens challenging their designations as "enemy combatants." Id. at 528-29. Measuring Hamdi's

"interest in being free from physical detention by one's own government," id. at 529, against

"the weighty and sensitive governmental interests in ensuring that those who have in fact fought

with the enemy during a war do not return to battle against the United States," id. at 531, the

plurality concluded "that a citizen-detainee seeking to challenge his classification as an enemy

combatant must receive notice of the factual basis for his classification[] and a fair opportunity to

rebut the [g]overnment's factual assertions before a neutral decisionmaker," id. at 533.

Aside from these "core elements," however, the plurality contemplated that "enemy-

combatant proceedings [might] be tailored to alleviate their uncommon potential to burden the

Executive at a time of ongoing military conflict."  Id.  The plurality went on to explain how that

"burden" might be lessened:

> Hearsay, for example, [might] need to be accepted as the most
> reliable evidence from the [g]overnment in such a proceeding.
> Likewise, the Constitution would not be offended by a
> presumption in favor of the [g]overnment's evidence, so long as
> that presumption remained a rebuttable one and fair opportunity
> for rebuttal were provided.  Thus, once the [g]overnment puts forth
> credible evidence that the habeas petitioner meets the enemy-
> combatant criteria, the onus could shift to the petitioner to rebut
> that evidence with more persuasive evidence that he falls outside
> the criteria.

Id. at 533-34.

Justice Souter and Justice Ginsberg concurred in the judgment of the plurality, but

dissented in part from the plurality's opinion.  In a separate opinion joined by Justice Ginsburg,

Justice Souter argued that 18 U.S.C. § 4001(a) "require[s] a clear statement of authorization to

detain," Hamdi, 542 U.S. at 545 (Souter, J., concurring in part and dissenting in part), which the

AUMF did not, in his estimation, necessarily provide, id. at 547-48.  Justice Souter conceded that

a plausible argument could be made that the AUMF authorized the President "to deal with

enemy belligerents according to the treaties and customs known collectively as the laws of war,"

id. at 548, but concluded that the government could not invoke such authority because it did not treat Hamdi as a prisoner of war as required by the laws of war, id. at 549-51.

Justice Scalia and Justice Stevens dissented from the plurality's opinion, asserting that United States citizens could only be tried in civilian courts absent lawful suspension of the writ of habeas corpus by Congress.  See id. at 554-579 (Scalia, J., dissenting) (reasoning that "[a]bsent suspension" of the writ of habeas corpus, "the Executive's assertion of military exigency has not been thought sufficient to permit detention without charge").  Justice Thomas wrote a separate dissent in which he "agree[d] with the plurality that the [f]ederal [g]overnment has [the] power to detain those that the [e]xecutive [b]ranch determines to be enemy combatants," id. at 589 (Thomas, J., dissenting), but rejected the balancing test adopted by the plurality as a means of determining the amount of process that must be afforded to citizens charged as enemy combatants, see id. at 589-92 ("[T]he Executive's decision that a detention is necessary to protect the public need not and should not be subjected to judicial second-guessing.").  Instead, he concluded that "an Executive, acting pursuant to statutory and constitutional authority, may, consistent with the Due Process Clause, unilaterally decide to detain an individual if the Executive deems this necessary for the public safety even if he is mistaken."  Id. at 590 (emphasis in original).

Based on this somewhat unusual voting alignment, the Supreme Court vacated the Fourth Circuit's judgment and remanded the case for further proceedings.  Id. at 539 (plurality opinion).  However, neither the plurality nor any of the partially concurring or dissenting justices attempted to address the outer boundaries of the "enemy combatant" definition.  Instead, the plurality predicted that "[t]he permissible bounds of the category [would] be defined by the lower courts as subsequent cases [were] presented to them."  Id. at 522 n.1.

This prediction did not come to pass—at least, not in the manner foreseen by the plurality.  On the same date that it issued Hamdi, a majority of the Supreme Court held in Rasul v. Bush, 542 U.S. 466 (2004), that alien detainees designated as enemy combatants could contest their detention at the Guantanamo Bay Naval Base in Guantánamo Bay, Cuba, under the federal habeas corpus statute, 28 U.S.C. § 2241.  See Rasul, 542 U.S. at 484 ("We . . . hold that § 2241 confers on the [d]istrict [c]ourt jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base.").  However, Congress effectively neutralized this ruling by passing the Detainee Treatment Act of 2005 (the "DTA"), Pub. L. No. 109-148, 119 Stat. 2680 (2005), which, inter alia, stripped the federal courts of jurisdiction over habeas corpus petitions filed by aliens detained at Guantánamo Bay or by individuals determined to have been properly detained as enemy combatants under the procedures set up by the DTA. Id. § 1005(e), 119 Stat. at 2741-42.  And when the Supreme Court thereafter held that the DTA did not apply retroactively to bar habeas corpus proceedings pending at the time of the DTA's enactment, Hamdi v. Rumsfeld, 542 U.S. 507, 575-84 (2006), Congress passed the Military Commissions Act of 2006 (the "MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006), which amended § 2241 to strip the federal courts of jurisdiction over detainee habeas corpus petitions retroactively as well as prospectively, Pub. L. No. 109-366, § 7(a), 120 Stat. at 2636.

Instead, it was not until the Supreme Court issued its decision in Boumediene v. Bush, ___ U.S. ___, 128 S. Ct. 2229 (2008), that the designation of individuals as "enemy combatants" by the President became susceptible to judicial review.  In that case, the Supreme Court held that individuals detained at Guantánamo Bay, Cuba, were protected by the Suspension Clause of the Constitution, and therefore were "entitled to the privilege of habeas corpus to challenge the legality of their detention."  Id. at ___, 128 S. Ct. at 2262.  The Court further found that the

review procedures established by the DTA did not constitute an adequate substitute for habeas corpus review.  Id. at ___, 128 S. Ct. at 2262-74.  The Court therefore held that "§ 7 of the [Military Commissions Act] operate[d] as an unconstitutional suspension of the writ" of habeas corpus for the Guantánamo Bay detainees.  Id. at 2240.

The Supreme Court's ruling in Boumediene cleared the way for the first opinion by a circuit court of appeals to address at length the scope of the President's authority to detain individuals as enemy combatants.  In al-Marri v. Pucciarelli, 534 F.3d 213 (4th Cir. 2008), vacated sub nom. al-Marri v. Spagone, ___ U.S. ___, 129 S. Ct. 1546 (2009) ("Spagone"), the Fourth Circuit addressed the legality of the military detention of a Qatari citizen (and United States resident) detained at the Naval Consolidated Brig in South Carolina.  Along with his wife and children, al-Marri entered the United States on September 10, 2001, ostensibly to obtain his master's degree at Bradley University located in Peoria, Illinois.  Id. at 219 (Motz, J., dissenting in part and concurring in part).  "Three months later, . . . FBI agents arrested al-Marri at his home in Peoria as a material witness in the [g]overnment's investigation of the September 11th attacks."  Id.

The government charged al-Marri with various offenses relating to the fraudulent obtainment and use of credit card numbers, but the criminal charges against him were dismissed when President Bush determined that al-Marri was an enemy combatant and ordered the Attorney General to surrender him to the custody of the Secretary of Defense.  Id.  Eventually, al-Marri's counsel filed a habeas corpus petition on his behalf in the United States District Court for the District of South Carolina.  Id. at 220.  In response, the government submitted a declaration from Jeffrey N. Rapp, Director of the Joint Intelligence Task Force for Combating Terrorism (the "Rapp Declaration"), in which Rapp asserted, inter alia, that al-Marri was sent by

al-Qaeda to the United States "to serve as a 'sleeper agent' to facilitate terrorist activities  and explore disrupting this country's financial system through computer hacking." Id.

After denying al-Marri's motion for summary judgment, the district court referred the case to a magistrate judge "for consideration of the appropriate process to be afforded al-Marri in light of Hamdi." Id. at 221.  "The magistrate judge ruled that the Rapp Declaration provided al-Marri with sufficient notice of the basis of his detention as an enemy combatant and directed al-Marri to file rebuttal evidence." Id.  When al-Marri failed to do so, contending instead "that the [g]overnment had an initial burden to produce evidence that he was an enemy combatant and that the Rapp Declaration did not suffice," the magistrate judge recommended dismissal of al-Marri's habeas corpus petition. Id.  The district court adopted that recommendation and dismissed al-Marri's petition in August of 2006. Id.

On appeal to the Fourth Circuit, a panel of the court reversed the district court's judgment and remanded the case for further proceedings. Id.  However, the government successfully moved for rehearing en banc, resulting in a per curiam judgment that again reversed the district court and remanded the case "for further proceedings consistent with the [court's several] opinions." Id. at 216-17.  Specifically, by a 5-to-4 vote, a majority of the court concluded "that, if the [g]overnment's allegations about al-Marri [were] true, Congress ha[d] empowered the President to detain him as an enemy combatant," while a second 5-to-4 ruling by a separate majority of the court held that "al-Marri ha[d] not been afforded sufficient process to challenge his designation as an enemy combatant." Id. at 216.

With respect to the first question; i.e., whether the government's allegations against al-Marri sufficed to justify his detention as an "enemy combatant," the court issued four separate opinions.  Three members of the court joined in an opinion written by Judge Motz in which she

concluded that al-Marri was not an "enemy combatant" under the traditional laws of war.  Id. at

217-53 (Motz, J., dissenting in part and concurring in part).  Judge Traxler, who sided with the

majority on both questions before the Court, wrote a separate opinion explaining his belief that

al-Marri was an "enemy combatant" based upon the plain language of the AUMF.  Id. at 257-62

(Traxler, J., concurring).  Chief Judge Williams wrote a separate opinion in which he concluded

that under Quirin and Hamdi, an individual is an enemy combatant if "(1) he attempts or engages

in belligerent acts against the United States, either domestically or in a foreign combat zone[] (2)

on behalf of a an enemy force."  Id. at 285 (Williams, C.J., concurring in part and dissenting in

part).  Finally, Judge Wilkinson issued a lengthy opinion joined by Judge Duncan in which he

concluded, after a sustained statutory and constitutional analysis, that to be an enemy combatant

"the person must (1) be a member of (2) an organization or nation against whom Congress has

declared war or authorized the use of military force, and (3) knowingly plans or engages in

conduct that harms or aims to harm persons or property for the purpose of furthering the military

goals of the enemy nation or organization."  Id. at 325 (Wilkinson, J., concurring in part and

dissenting in part).[3]

     Boumediene's effects were quickly felt in this Circuit as well.  On remand in

Boumediene v. Bush, 583 F. Supp. 2d 133 (D.D.C. 2008), Judge Leon of this Court proceeded to

determine "what definition of 'enemy combatant' should be employed in the upcoming hearings

in [that] case."  Id. at 134.  Declining to engage in what he described as the "temptation . . . to

engage in the type of judicial craftsmanship . . . exhibited in" al-Marri, Judge Leon chose instead

---

[3]  Following this split decision from the Fourth Circuit, al-Marri successfully petitioned the Supreme Court to issue a
writ of certiorari to decide whether the President could detain him as an "enemy combatant."  al-Marri v. Pucciarelli,
___ U.S. ___, ___, 129 S. Ct. 680, 680 (2008).  However, the current administration, reversing the position of the
prior administration, declined to hold al-Marri as an "enemy combatant" any further, and released him into the
custody of the Attorney General so that he could indicted and tried for the various criminal offenses that led to his
initial arrest.  This decision caused  the Supreme Court to dismiss the case before it and vacate as moot the Fourth
Circuit's decision.  Spagone, ___ U.S. at ___, 129 S. Ct. at 1546.

to adopt the definition of "enemy combatant" "crafted by the Department of Defense in 2004 for the type of Combatant Status Review Tribunal ('CSRT') proceedings that [the six petitioners in the case before him] were given." Id. at 134.  Judge Leon considered this definition to have been "blessed by Congress" when, in drafting the Military Commissions Act, "Congress, in defining the term 'unlawful enemy combatant,' specifically provided that it included persons who had been 'determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.'" Id. (quoting 10 U.S.C. § 948a).  Adopting the same definition "employed" in such tribunals, Judge Leon defined an enemy combatant as "an individual who was part of or supporting Taliban or al-Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners," including "any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." Id. at 135.

Following the process utilized by Judge Leon, the undersigned member of the Court ordered briefing from individual petitioners who sought immediate release from detention solely on the grounds that the factual allegations made by the government, even if true, did not suffice as a legal matter to justify their detention.  The Court scheduled hearings on the merits of three such requests for January 21, 2009.  However, less than an hour after the inauguration of President Obama, the government requested a temporary stay of these hearings so that it could reassess its position on the scope of the President's authority to detain the petitioners as so-called "enemy combatants."  After a series of requests for extension of this stay by the government, the undersigned member of the Court joined several other members of the Court in directing the government to file a memorandum of law reflecting any changes in its position by March 13, 2009.

The government made use of this opportunity, modifying its standard for detaining individuals like the petitioners.  Whereas it had previously asserted that the President could detain as an enemy combatant "those individuals who were part of, or supporting, forces engaged in hostilities against the United States or its coalition partners and allies," Gov't's Opp'n at 3, the government now argues that it can detain "persons who were part of, or <u>substantially</u> supported, Taliban or al-Qa[e]da forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy forces."  Gov't's Mem. at 2 (emphasis added).  The government has also clarified that it believes that its detention authority arises solely from the AUMF.  <u>Id.</u> at 1.[4]

However, the government believes that "[i]t is neither possible nor advisable . . . to attempt to identify[] in the abstract[] the precise nature and degree of 'substantial support,' or the precise characteristics of 'associated forces.'"  <u>Id.</u> at 2.  Instead, it opines that "the contours of the 'substantial support' and 'associated forces' bases of detention will need to be further developed in their application to concrete facts in individual cases."  <u>Id.</u>  The government recommends that the Court look to "various analogues from traditional armed conflicts" in deciding these individual cases.  <u>Id.</u>

---

[4]  Under the Bush administration, the government had repeatedly asserted that it could detain individuals pursuant to the President's authority as Commander-in-Chief under Article II, § 2, clause 1 of the Constitution, which provides that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States."  <u>See, e.g.</u>, <u>Hamdi</u>, 542 U.S. at 516-17 (plurality opinion) ("The [g]overnment maintains that no explicit congressional authorization is required[] because the Executive possesses plenary authority to detain pursuant to Article II of the Constitution."); <u>al-Marri</u>, 534 F.3d at 221 (Motz, J., dissenting in part and concurring in part) ("Alternatively, the [g]overnment contends that even if the AUMF does not authorize the President to order al-Marri's military detention, the President has 'inherent constitutional power' to do so.").  Similar assertions were previously made to this Court.  <u>See</u> Resp'ts' Opp'n at 9 ("[T]he President's power under the Constitution . . . confirm[s] his authority to detain these petitioners under the [g]overnment's proposed enemy combatant definition.").  These contentions are absent from the government's most recent memorandum of law.

The petitioners, for their part, find the government's "refined" position no more palatable than its original one, finding it overly broad and ambiguous.  They argue that only those individuals who "actually and directly engaged in the armed conflict against the United States in Afghanistan" are subject to detention pursuant to <u>Hamdi</u>, Pet'rs' Reply at 22, and that "the military detention power claimed by [the government] is neither consistent with nor derived from the traditional law of war," <u>id.</u> at 21.  "Rather, it represents an attempt by [the government] to legislate new and far broader standards for a conflict that . . . is not appropriately governed by the standards that are a matter of 'universal agreement and practice.'"  <u>Id.</u> at 21 (quoting <u>Hamdan</u>, 542 U.S. at 518).

At least one petitioner, Majid Khan,[5] advances an even narrower view of the scope of the President's detention authority.[6]  According to Khan, the government may not rely upon "law of war principles applicable to international armed conflicts," Khan Mem. at 3, because the conflict between the United States and al-Qaeda is a <u>non</u>-international armed conflict for purposes of international law, <u>id.</u> at 2, 10-11.  Arguing that "the legal basis for detention" in a non-international armed conflict "is located in domestic law, not international law," <u>id.</u> at 9, Khan submits that the President's detention authority "must be authorized by domestic law," <u>id.</u> at 3. He further argues that the AUMF is <u>not</u> such a source of authority, <u>id.</u> at 11-16, and therefore asserts that detainees like him "must be charged in a civilian court or released," <u>id.</u> at 16.

---

[5]  Another petitioner, Sanad Ali al-Kazimi, has explicitly joined in Khan's memorandum of law, and a ruling in Khan's favor would obviously benefit the petitioners as a whole because of the general applicability of such a ruling.

[6]  The Court initially ordered the petitioners to file one consolidated memorandum of law in response to the government's revised position on the scope of the President's detention authority and designate one attorney to argue the merits of that brief at the oral argument scheduled by the Court.  The Court subsequently granted Khan leave to file a supplemental memorandum of law and argue separately at the hearing on the merits of the parties' positions when it became clear to the Court that Khan intended to advance arguments not raised by the other petitioners that were nevertheless applicable to many of them.

The Court heard argument from the parties regarding the scope of the President's authority to detain individuals pursuant to the terms of the AUMF on March 23, 2009.  At the conclusion of that hearing, the Court concluded that the issue before it was too complex to be resolved by way of an oral ruling and indicated that it would memorialize its conclusions in a memorandum opinion to be issued as soon as was practicable.  The analysis below represents the Court's best effort to fulfill that promise, and, at least for those cases pending before this member of the Court, hopefully marks a significant step towards the resolution of these seemingly interminable proceedings.

## II. Legal Analysis

Based upon the positions taken by the parties in their respective memoranda of law, the issues before the Court are two-fold.  First, the Court must determine whether the AUMF authorizes the President to detain anyone incidental to the government's conflict with any organization (as opposed to nation) responsible for the 9/11 attacks.  Second, assuming such authority exists, the Court must then determine whether the AUMF permits the government to detain individuals who have "substantially supported" such organizations as the government suggests, or if instead a different, narrower standard must prevail.[7]  For the reasons explained at length below, the Court agrees with the government that the AUMF functions as an independent basis in domestic law for the President's asserted detention authority, and adopts the basic framework advanced by the government for determining whether an individual is subject to that authority.  The Court therefore adopts the "substantial support" standard employed by the

---

[7]  This memorandum opinion concerns itself solely with the question of the scope of the President's authority to detain <u>all</u> of the petitioners; thus, it does not address the many other issues arising from the petitioners' detention that is specific to individual detainees, such as whether the President can militarily detain an individual subject to the protections of the United States Constitution and 18 U.S.C. § 4001(a), or whether the conflict between the United States and the Taliban should be considered an international or non-international armed conflict since the installment of a new government in Afghanistan in 2004.  These issues must be resolved on a case-by-case basis.

government as the governing standard for detention in these cases, but only insofar as the

government's announced standard is consistent with that framework.

A.      The President's Detention Authority in a Non-International Armed Conflict

The first task before the Court is to determine whether the AUMF permits the President

to detain any individual in connection with the conflict between the United States and the enemy

"organizations" named in that joint resolution.  Majid Khan argues that it does not.  He asserts

that the AUMF "does not authorize military detention beyond the limited authority to detain that

is incident to the use of force under the law of war principles governing international armed

conflict."  Khan Mem. at 12 (emphasis removed).  Because the conflict between the United

States and any "organizations" named in the AUMF, such as al-Qaeda, is not, according to Khan,

an international armed conflict for purposes of the laws of war, he argues that the AUMF does

not reach individuals fighting on behalf of those organizations.  Id. at 13-16.  Instead, he opines

that such individuals may be detained only under the sole domestic law that applies to them; i.e.,

the various statutes in the United States code criminalizing terrorist activities.  See id. at 16

("Khan . . . must be charged in a civilian court or released.").

Khan's position cannot be reconciled with the plain language of the AUMF.  In that joint

resolution, Congress conferred upon the President all "necessary and proper" authority to

execute military combat against both "nations" and "organizations" that carried out the 9/11

attacks.  And in Hamdi, the Supreme Court found that the "detention of individuals falling into

the limited category" before it was "so fundamental and accepted an incident to war as to be an

exercise of the 'necessary and appropriate force' Congress ha[d] authorized the President to use."

Hamdi, 542 U.S. at 518 (plurality opinion).  Given that the "detention of individuals" is an

"exercise" of military force authorized by Congress in the AUMF with respect to the enemy

nations named therein, and given that Congress authorized the same amount of force with respect to enemy "organizations" as it did with respect to enemy nations, it stands to reason that Congress intended to confer upon the President the same authority to detain individuals fighting on behalf of enemy organizations that it conferred upon him with respect to enemy nations.  See al-Marri, 534 F.3d at 260 (Traxler, J., concurring) ("[I]t strains reason to believe that Congress, in enacting the AUMF in the wake of [the 9/11] attacks, did not intend for it to encompass al[-]Qaeda operatives standing in the exact position as the attackers who brought about its enactment." (emphasis in original)).

Khan attacks this straightforward proposition in a number of ways, but none are persuasive.  First, he argues that the plurality opinion in Hamdi is not binding on this Court because Justice Souter, whose concurring opinion provided the fifth vote for the judgment in favor of Hamdi, concluded that "[the] AUMF does not authorize detention."  Khan Mem. at 12.  Khan is wrong on both counts.  Justice Souter allowed for the possibility that the AUMF could authorize the detention of individuals "according to the treaties and customs known collectively as the laws of war," Hamdi, 542 U.S. at 548 (Souter, J., concurring).  However, he found "no need . . . to address the merits" of that argument because, in his view, the government's failure to accord Hamdi the full protections of the Geneva Conventions prevented the President from invoking such authority.  Id. at 549.  He did not purport to answer the question of the President's detention authority under the AUMF one way or the other.

In any event, Justice Souter concurred only in the plurality's judgment of reversal, not its conclusion that the AUMF authorized the detention of enemy combatants.  See id. at 553 (joining with the plurality "to give practical effect to the conclusions of [the] eight Members of the Court rejecting the [g]overnment's position . . . on terms closest to those [Justice Souter]

would impose").  It was Justice Thomas, dissenting from the judgment, who "agree[d] with the

plurality that the [f]ederal [g]overnment has [the] power to detain those that the [e]xecutive

[b]ranch determines to be enemy combatants."  Id. at 589 (Thomas, J., dissenting).  Thus, a

majority of the Court embraced the position that the AUMF authorizes the President to detain

individuals as a "fundamental and accepted . . . incident [of] war."  Id. at 518 (plurality opinion).

       Khan also argues that Hamdi does not apply to him (and other similarly situated

petitioners) because Hamdi involved an individual fighting on behalf of the Taliban on the

battlefield in Afghanistan, not a member of a terrorist organization like al-Qaeda.  Khan draws a

distinction between the conflict between the United States and the Taliban, which he

characterizes as "international" in nature for purposes of the Geneva Conventions, and the

conflict between the United States and organizations like al-Qaeda, which is not.  Khan Mem. at

12-14.  He posits that in finding detention authority to be a "fundamental . . . incident of war,"

the Supreme Court "merely interpreted the AUMF to authorize that which was already an

incident of the laws of war applicable to international armed conflict—the power under the

Geneva Conventions to detain 'combatants' in the international armed conflict between the

United States and the Taliban government forces of Afghanistan."  Id. at 13.  According to Khan,

"Hamdi therefore cannot be said to apply to or govern detention in [a] non-international armed

conflict because . . . the law of war principles for detention applied by the Court in Hamdi are

absent from the laws of war applicable to non-international armed conflict."  Id. at 13-14.

       This is a strained interpretation of Hamdi at best.  As the government points out, "Hamdi

did not limit the detention authorized by the AUMF to cases of international armed conflict or to

cases in which enemy forces satisfy the prisoner-of-war provisions of Article 4 of the Third

Geneva Convention," but rather "determined that the scope of detention authority would have to

be decided in future cases."  Khan Reply at 2 (citing <u>Hamdi</u>, 542 U.S. at 522 n.1 (plurality

opinion)).  In point of fact, the plurality did not even mention the Geneva Conventions in

concluding that the AUMF implicitly conferred detention authority upon the President, choosing

instead to rely primarily upon its own prior decision in <u>Quirin</u>, a smattering of treatises and law

review articles on the subject, and the Ninth Circuit's decision in <u>In re Territo</u>, 156 F.2d 142 (9th

Cir. 1946).

What little insight the plurality provided in <u>Hamdi</u> concerning how it would treat

individuals fighting on behalf of al-Qaeda suggests that the result would be no different from the

conclusion the Court reached with respect to Hamdi.  It is telling that the plurality expressed "no

doubt that individuals who fought against the United States in Afghanistan as part of the Taliban,

<u>an organization known to have supported the al[-]Qaeda terrorist network responsible for those</u>

<u>attacks</u>, [were] individuals Congress sought to target in passing the AUMF."  <u>Hamdi</u>, 542 U.S. at

518 (plurality opinion) (emphasis added).  If the Court had "no doubt" that Congress "sought to

target" individuals who merely fought on behalf of "an organization known to have supported"

al-Qaeda, it beggars belief to suggest that the Supreme Court would not find congressional

authorization for the President to "target" individuals who fight on behalf of al-Qaeda itself.

But regardless of whether this Court is bound by the plurality's decision in <u>Hamdi</u>, the

fact remains that Khan has no adequate explanation for why the Court <u>should</u> not apply the

plurality's reasoning to the conflict between the United States and enemy organizations named in

the AUMF.  The only reason provided by Khan is that the war against the Taliban is an

"international" conflict, whereas the war against al-Qaeda and its ilk are not.[8]  But, as the

---

[8] In <u>Hamdan</u>, the Supreme Court held that the conflict between the United States and al-Qaeda is at least a non-international armed conflict subject to Common Article 3, but did not reverse the determination made by the District of Columbia Circuit that the conflict was not an international conflict subject to Common Article 2.  <u>See</u> <u>Hamdan</u>, (continued . . .)

analysis below demonstrates, that is no reason to refuse to apply the plurality's logic in <u>Hamdi</u> to the situation at hand.

The distinction drawn between "international" and "non-international" conflicts has its roots in the Geneva Conventions, four treaties that comprise a part of "the rules and precepts of the law of nations." <u>Hamdan</u>, 548 U.S. at 613. Two articles are identical in the Third and Fourth Conventions, and thus are known as "common articles": Common Article 2, which specifies that the Conventions apply to "all cases of declared war or any other armed conflict which may arise between two or more of the High Contracting Parties," Geneva Convention Relative to the Treatment of Prisoners of War art. 2, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (the "Third Geneva Convention"), and Common Article 3, which governs "armed conflict[s] not of an international character," <u>id.</u>, art. 3.[9] Participants in a conflict falling under Common Article 2 are subject to the requirements and protections of the Conventions, whereas participants in a conflict falling under Common Article 3 are subject only to the strictures of that article, essentially making Common Article 3 a "mini-convention." International armed conflicts are also governed by a subsequently enacted treaty known as the Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts, or "Additional Protocol I," whereas yet another treaty, the Protocol Additional to the Geneva Conditions of 12 August 1949, and relating to the Protection of Victims of Non-

---

548 U.S. at 628-29 (declining "to decide the merits" of the government's argument that the conflict between the United States and al-Qaeda is not an international armed conflict "because there [was] at least one provision of the Geneva Conventions that applie[d]" to the conflict). The Court is therefore constrained by the precedent of the Supreme Court and the District of Columbia Circuit to treat the conflict between the United States and al-Qaeda as a non-international armed conflict for purposes of the Geneva Conventions.

[9] For ease of reference, the Court cites only to the common articles in the Third Geneva Convention.

International Armed Conflicts, or "Additional Protocol II," applies to non-international armed conflicts.[10]

Among the protections afforded in international armed conflicts are the prisoner-of-war provisions set forth in the Third Geneva Convention. These provisions, which apply to prisoners of war as that term is defined in Article 4 of the Third Geneva Convention, regulate virtually every aspect of a prisoner of war's detention, including, inter alia, the manner in which they may be treated by their captors, see, e.g., id., art. 13-18, the conditions of their confinement, see, e.g., id., art. 25-32, 34-42, and the termination of their detention, see, e.g., id., art. 109-19. In contrast, Common Article 3 is silent with respect to prisoners of war. Thus, in non-international armed conflicts, the Geneva Conventions are "silent, in deference to national law, on questions of detention." Gabor Rona, An Appraisal of U.S. Practice Relating to "Enemy Combatants", 10 Y.B. Int'l Humanitarian L. 232, 241 (2007).

Khan argues that this silence forecloses military detention in non-international armed conflicts under the AUMF. As noted above, he conflates the plurality's conclusion in Hamdi that the "detention of individuals" is a "fundamental and accepted . . . incident to war" with "the

---

[10]  The United States has signed but not ratified Additional Protocol I. It has neither signed nor ratified Additional Protocol II. However, the Department of State has explicitly recognized that "certain provisions" of Additional Protocol I reflect customary international law, see Michael J. Matheson, The United States Position on the Relation of Customary International Law to the 1977 Protocols Additional to the 1949 Geneva Conventions, 2 Am. Univ. J. Int'l L. & Pol'y 419, 421 (1987), including "the principle that no order be given that there shall be no survivors . . . contained in [A]rticle 40" of the protocol, "the principle that persons entitled to combatant status be treated as prisoners of war in accordance with the 1949 Geneva Conventions," id. at 425, the principle that "immunity not be extended to civilians who are taking part in hostilities," id. at 426, and, "in particular[,] fundamental guarantees contained in [A]rticle 75" of the protocol, "such as the principle that all persons who are in the power of a party to a conflict and who do not benefit from more favorable treatment under the [Geneva] Conventions be treated humanely in all circumstances," id. at 427. Similarly, the Department of State has opined that "[t]he basic core of [Additional] Protocol II," as "reflected in [C]ommon [A]rticle 3 of the 1949 [Geneva] Conventions[,] . . . is[ ] and should be[ ] a part of generally accepted customary law." Id. at 430-31. "This specifically includes its prohibitions on violence toward persons taking no active part in hostilities, hostagetaking, degrading treatment, and punishment without due process." Id. at 431. The Court therefore construes Additional Protocol I and Additional Protocol II to constitute customary international law at least with respect to the principles listed above, and also as elucidations of the customary humanitarian protections enshrined in the Geneva Conventions where appropriate.

power under the Geneva Conventions to detain 'combatants' in [an] international armed

conflict." Khan Mem. at 13.  Given that there is no such "power" in the Geneva Conventions

with respect to non-international armed conflicts, Khan concludes that the AUMF could not have

conferred any detention authority to the President with the "clear statement" required for such a

grant of authority to be constitutional.  Id. at 16.  He cites an article written by an international

humanitarian law scholar and an amicus brief filed by experts in the laws of war in Ali al-Marri's

Supreme Court case as support for this view.  See id. at 9 (citing Rona, supra, at 240-41, and

Brief for Amici Curiae Experts in the Law of War, al-Marri v. Spagone, No. 08-368, at 22 (Jan.

28, 2009) (the "Law of War Experts' Br."))._[11]_

    This proposition depends upon the decidedly suspect notion that the laws of war in

general, and the Third Geneva Convention in particular, do not simply regulate the conditions of

detention in an international armed conflict, but also actually authorize detention in such a

conflict.  From this premise, proponents of this view equate the absence of regulations regarding

detention in Common Article 3 with a total lack of authorization for a state engaged in a non-

international armed conflict to detain individuals at all.  The academics cited by Khan explain

this position as follows:

> As reflected in the plurality decision in Hamdi, [the laws of war]
> suppl[y] definite authority for the detention as "combatants" of
> individuals fighting on behalf of an enemy nation.  See 542 U.S. at

---

[11]  Khan also cites Ex parte Milligan, 71 U.S. 2 (1866), as a case that "squarely addresses the authority of the
Executive to detain civilians under law of war principles applicable to non-international armed conflict[s]." Khan
Mem. at 15 (emphasis removed).  Milligan does nothing of the sort.  In that case, Lambdin Milligan, a resident of
Indiana and citizen of the United States, "was brought before a military commission" in October of 1864, "tried on
certain charges and specifications[,] found guilty, and sentenced to be hanged."  Id. at 107.  Finding Milligan to be
neither "a resident of one of the rebellious states" of the Confederacy "[n]or a prisoner of war, but a citizen of
Indiana . . . [who was] never in the military or naval service," id. at 118, the Supreme Court held that trying Milligan
by a military commission constituted a violation of his constitutional rights, id. at 122-25.  As the Supreme Court
subsequently explained in Quirin, the case stands for the proposition that a person may not be subjected to military
detention if the person is "not . . . a part of or associated with the armed forces of the enemy."  Quirin, 317 U.S. at
45.  In other words, Milligan concerns the rights of individuals who are not party to non-international armed
conflicts; it says nothing about the laws of war governing such conflicts.

518; <u>see also</u> Third Geneva Convention, art. 21 ("The Detaining Power may subject prisoners of war to internment."); Gabor Rona, <u>An Appraisal of U.S. Practice Relating to "Enemy Combatants"</u>, 10 Y.B. of Int'l Humanitarian L. 232, 240-41 (2009) ("In international armed conflicts, the Geneva Conventions have long supplied a clearly defined and established legal framework for detention."), <u>available                              at</u> http://papers.ssrn.com/so13/papers.sfm?abstract_id=1326551. Such authorization makes sense in the context of inter-state conflict, which often is conducted outside the territory of the power seeking to prevent the return of fighters to the battlefield, far from the arena of domestic laws and institutions.  <u>See, e.g.</u>, <u>id.</u> at 240-41; John Cerone, <u>Jurisdiction and Power: The Intersection of Human Rights Law and the Law of Non-International Armed Conflict</u>, 40 Isr. L. Rev. 396, 402 (2007).

. . .

To the contrary, Common Article 3 affords certain humanitarian protections to those detained, as does [A]rticle 5 of Additional Protocol II (insofar as it applies), which lists a number of provisions governing treatment of "[p]ersons whose liberty has been restricted."   But neither treaty furnishes independent <u>authorization</u> for the detention of any defined class of people.

Law of War Experts' Br. at 19-20, 22-23 (emphasis in original).

Unfortunately for Khan, neither the Geneva Conventions nor the additional protocols to those conventions support this hypothesis.  As an initial matter, Article 21 of the Third Geneva Convention—the sole article of the Geneva Conventions cited by Khan's experts as "authoriz[ing] detention"—concerns the internment, not the detention, of prisoners of war.  <u>See</u> Third Geneva Convention, art. 21 ("The Detaining Power may subject prisoners of war to internment.  It may impose on them the obligation of not leaving, beyond certain limits, the camp where they are interned, of if the said camp is fenced in, of not going outside its perimeter.").  As the International Committee of the Red Cross explains in its commentary on this article, "[t]o intern a person is to put him in a certain area or place—in the case of prisoners of war, usually a camp—and to forbid him to leave its limits."  International Committee of the Red Cross,

<u>Commentary on the Geneva Convention Relative to the Treatment of Prisoners of War</u>, at 178

(Pictet et al. eds. 1960) (the "ICRC Third Geneva Convention Commentary").[12]  This

"concept . . . should not be confused with that of detention."  <u>Id.</u>  Prior to internment,

"[p]risoners of war are [already] in the power of the [s]tate which has captured them."  <u>Id.</u>

     Article 21 is not unique in presuming detention of the individuals protected by the Third

Geneva Convention.  In fact, <u>all</u> of the articles regulating the detention of prisoners of war—

including the article defining the term "prisoner of war"—presuppose rather than provide for

detention by the enemy.  <u>See, e.g.</u>, Third Geneva Convention, art. 4(A) ("Prisoners of war, in the

sense of the present Convention, are persons belonging to one of the following categories, who

have fallen into the power of the enemy . . . .").  Additional Protocol I is structured in the same

manner.  <u>See</u> Additional Protocol I, art. 44.1 ("Any combatant . . . who falls into the power of an

adverse Party shall be a prisoner of war."); <u>see also</u> International Committee of the Red Cross,

<u>Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12</u>

<u>August 1949</u>, at 522 (Sandoz et al. eds. 1987) (the "ICRC Additional Protocols Commentary")

("Those combatants complying with the general conditions laid down in Article 43, which gives

an overall definition of armed forces, have the right, <u>when captured</u>, to prisoner-of-war status."

(emphasis added)).[13]  Nothing in the texts of the Geneva Conventions or Additional Protocol I

---

[12]  "The International Committee of the Red Cross is referred to by name in several provisions of the [ ] Geneva
Conventions and is the body that drafted and published the official commentary to the Conventions.  Though not
binding law, the commentary is . . . relevant in interpreting the Conventions' provisions."  <u>Hamdan</u>, 548 U.S. at 619
n.48.

[13]  The phrase "fallen into the power" has been interpreted by the International Committee of the Red Cross as
having a broader meaning than the term "captured."  ICRC Additional Protocols Commentary, <u>supra</u>, at 481.  The
latter phrase suggests that the individual "ha[s] been taken into custody," <u>id.</u>, whereas the former term refers to any
situation where "the adverse [p]arty . . . is able to impose its will upon" the individual in question.  <u>Id.</u> at 485.  This
broader interpretation is necessary to protect combatants who have been rendered <u>hors de combat</u>; <u>i.e.</u>, out of the
fight, but have not yet been physically apprehended.  <u>See id.</u> at 481 (explaining the need "to create a concrete link
between the moment when an enemy soldier is no longer a combatant because he is <u>hors de combat</u>, and the moment
(continued . . .)

remotely support the proposition that the laws of war "suppl[y] definite authority for the

detention as 'combatants' of individuals fighting on behalf of an enemy nation."  Law of War

Experts' Br. at 19.

　　　To the contrary, the commentary to the Third Geneva Convention provided by the

International Committee of the Red Cross makes clear that the prisoner-of-war provisions of that

convention restrict rather than enable the discretion of the detaining state.  The commentary

explains that

> In ancient times, the concept of "prisoner of war" was unknown.
> Captives were the "chattels" of their victors who could kill them or
> reduce them to bondage.  Throughout the ages, innumerable
> captives owed humane treatment no doubt to the mercy of their
> victors. . . . [M]ore than a century [from the French Revolution]
> had to elapse, and the Hague Convention of 1899 . . . to be
> reached, before the [s]tates were ready to limit their respective
> sovereign rights concerning the treatment of prisoners of war, and
> before prisoners were granted their own statute in international
> law[] protecting them from arbitrary treatment by the [d]etaining
> [p]ower, and which may also be invoked by them against that
> [p]ower.

ICRC Third Geneva Convention Commentary, supra, at 45-46.

　　　Indeed, detention in lieu of the barbaric rule of "no quarter" is itself a restriction on the

"sovereign rights" of the state.  See Additional Protocol I, art. 40 ("It is prohibited to order that

there shall be no survivors, to threaten an adversary therewith[,] or to conduct hostilities on this

basis."); see also ICRC Additional Protocols Commentary, supra, at 381-82 (noting the

"humanitarian rules" that "prohibit refusing to give quarter"); William Winthrop, Military Law

and Precedents 788 (William S. Hein & Co. 2d ed. 2000) ("The time has long passed when 'no

quarter' was the rule on the battlefield, or when a prisoner could be put to death by virtue simply

---

when he becomes a prisoner of war").  It has no bearing as to whether the Third Geneva Convention or Additional
Protocol I authorize detention in the first instance.

of his capture,"").  As the International Committee of the Red Cross notes in its commentary to

Additional Protocol I, "[i]nitially this rule was accepted with regard to peoples of the same race,

the same religion, or with whom there were neighbo[rly] relations in times of peace, but

eventually it was also imposed, though not without difficulty, in favo[r] of those who were also

considered strangers."  ICRC Additional Protocols Commentary, supra, at 474.  Absent this

proscription, the state could simply kill members of the enemy force rendered hors de combat;

i.e., out the fight.  See Winthrop, supra, at 783 (opining that persons "not recognized . . . as

legitimate troops or entitled, when taken, to be treated as prisoners of war, . . . may upon capture

be summarily punished even with death").[14]

      The laws of war governing non-international armed conflicts are no different in this

regard.  Common Article 3 requires that "members of [the enemy's] armed forces who have laid

down their arms . . . be treated humanely."  Third Geneva Convention, art. 3(1).  This includes a

proscription against "violence to [the] life and person" of the surrendered enemy fighter, "in

particular[,] murder of all kinds."  Id., art. 3(1)(a).  Additional Protocol II is even more direct: it

explicitly provides that "[i]t is prohibited to order that there shall be no survivors."  Additional

Protocol II, art. 4.1.  Thus, regarding the "authority" to detain individuals in an armed conflict,

the laws of war are silent with respect to both international and non-international armed

conflicts.  Yet, these same laws require the state to detain rather than summarily execute fighters

in such conflicts.  The obvious implication, consistent with historical practice, is that these

provisions, far from "authorizing" detention in one context but not another, act as restraints on

---

[14]  Winthrop's treatise on the laws of war obviously predates the broader protections accorded to enemy fighters by the Geneva Conventions and their additional protocols, but this actually makes it more helpful in understanding the sovereign rights of the state absent the restrictions of those treaties.

the inherent authority of the state to exercise military force in whatever manner it deems

appropriate.

The Court is therefore baffled by the assertion, repeated throughout Khan's memorandum

of law and at oral argument, that the President could take military action against an organization

like al-Qaeda under the AUMF but could not detain anyone fighting on behalf of that

organization as part of that military action.  See Khan Mem. at 4 ("Even if the government were

authorized under the AUMF to use force against [Khan,] . . . that power would not provide

related authority to detain him in the context of the non-international armed conflict

with . . . [a]l[-]Qaeda."); id. at 12 ("The AUMF also contains no express authorization for

military detention; its focus is clearly on the use of military force."); id. at 17 ("[E]ven if

Congress has authorized the use of lethal force against . . . [a]l-[Q]aeda forces wherever they are

located throughout the world, that does not mean that the government may detain someone who

is suspected of being a[n] [a]l[-]Qaeda fighter indefinitely under the AUMF."); Hr'g Tr. 7:6-9,

Mar. 23, 2009 ("MR. DIXON: . . . [U]nder the laws of war, the right to use force and the right to

detain are not the same.").  As the foregoing analysis demonstrates, detention is an exercise of

the state's "right to use force," and often a required one at that.  And it is in this sense that

detention is, as the plurality noted in Hamdi, "a fundamental incident of waging war."  Hamdi,

542 U.S. at 519 (plurality opinion).

That the plurality in Hamdi supported this observation through recourse to cases arising

in the context of international armed conflicts does not restrict the logic of its observation to that

milieu.  Non-international armed conflicts, no less than their international counterparts, require

the exercise of military force by the state, else they would not qualify as "armed conflicts" in the

first place.  See ICRC Third Geneva Convention Commentary, supra, at 37 ("[I]t must be

recognized that the conflicts referred to in Article 3 are armed conflicts, with <u>armed forces</u> on

either side engaged in <u>hostilities</u> . . . .” (emphasis in original)).  And whenever the President can

lawfully exercise military force, so, too, can he incapacitate the enemy force through detention

rather than death.  <u>Cf.</u> ICRC Third Geneva Convention Commentary, <u>supra</u>, at 45-46 (noting that

“[t]hroughout the ages, innumerable captives owed humane treatment no doubt to the mercy of

their victors”).  This authority inheres in the right to exercise military force itself, not the

regulatory schemes of the Geneva Conventions and its additional protocols.

If Khan were correct, Osama bin Laden could be killed but not detained by the United

States military, and provisions in the Geneva Conventions intended to restrict a state’s sovereign

authority must be interpreted as providing that authority.  The Court declines to indulge such

fantasies.  The reality is that Congress authorized the same use of military force, and thus

conferred upon the President the same degree of detention authority, with respect to

“organizations” responsible for the 9/11 attacks as it did with respect to the “nations” responsible

for those attacks.  Only the extent to which that authority is restricted by the laws of war varies

based on whether the armed conflict falls under the rubric of Common Article 2 or Common

Article 3.  Khan’s arguments to the contrary are without merit and are therefore rejected in their

entirety.

B.      <u>Scope of the President’s Detention Authority</u>

Having concluded that the AUMF authorizes the detention of individuals in the non-

international armed conflict between the United States and the enemy “organizations” named in

the AUMF, the Court turns to the question of the scope of that authority.  The government

suggests that in non-international armed conflicts, the President can detain anyone who is a

member of a “dissident armed force[]” or “other organized armed group[]” engaged in hostilities

with the United States.  Gov't's Mem. at 9.  It further asserts that the determination whether an individual is a member of such a group must be informed by "[p]rinciples derived from law-of-war rules governing international armed conflicts," id. at 1, such as the criteria for "determining whether someone is part of an irregular volunteer militia that would be covered under Article [4] of [the Third Geneva Convention]," Hr'g Tr. 49:24-50:1, Mar. 23, 2009.  "Evidence relevant" to this determination "might range from formal membership, such as through an oath of loyalty, to more functional evidence, such as training with al-Qa[e]da."  Gov't's Mem. at 6.

The petitioners take a very different view.  Looking to the other articles of the Third Geneva Convention and Additional Protocol I for guidance, they distinguish between "'combatants,' who may be properly detained, and 'non-combatants,' who may not."  Pet'rs' Reply at 16.  They describe the "combatant" category as consisting of "members of State armed forces and other forces described in Article 4 of the Third Geneva Convention," as well as "civilians who actively and directly participate in hostilities."  Id.  Because the members of al-Qaeda and similar organizations do not qualify as "combatants" under Article 4, the petitioners contend that the only individuals subject to detention in this non-international armed conflict are "civilians who give up the protections of civilian status by participating actively and directly in hostilities as part of an organized armed force."  Pet'rs' Mem. at 5.  The petitioners defend this "'direct participation in hostilities' standard" as "a critical distinction in the law of armed conflict," for whereas "combatants" within the meaning of Article 4 of the Third Geneva Convention "may be deliberately targeted with deadly force, . . . civilians who are not participating in hostilities may not."  Id. at 6.

The petitioners' reliance on the standards governing international armed conflict is understandable given the government's longstanding justification of its detention of the

petitioners on the grounds that they were "enemy combatants."  This term has meaning under the

Geneva Conventions only insofar as it is construed as a subset of "prisoner of war" status, which

the Third Geneva Convention defines at length.  See Third Geneva Convention, art. 4(A)

(delineating the categories of individuals who qualify for prisoner of war status); see also

Additional Protocol I, art. 44.1 (providing that "combatant[s] . . . who fall[] into the power of an

adverse Party" are prisoners of war); ICRC Additional Protocols Commentary, supra, at 515

("All members of the armed forces are combatants, and only members of the armed forces are

combatants.").  Status as a "combatant" is actually a privilege—"the right to participate in

hostilities," Additional Protocol I, art. 43.2—to be earned through fidelity to the requirements of

Article 4.

At least for those petitioners detained due to their associations with terrorist organizations

like al-Qaeda, there is little question that such individuals fail to satisfy these requirements.

While the term "armed forces" is defined broadly in the Third Geneva Convention, "the non-

recognized government or authority" sponsoring the putative "armed forces" in question "must

represent, or must claim to represent, a subject of international law recognized as such by the

other Party to the conflict," ICRC Additional Protocols Commentary, supra, at 508, and must be

"indissolubly bound" by the rules that govern international warfare, id. at 513.  "Anyone who

participates directly in hostilities without being subordinate to an organized movement" that

"enforc[es] compliance with these rules[] is a civilian."  Id. at 514.

Thus, under the combatant/civilian distinction formerly drawn by the government, the

petitioners would appear to fall under the rubric of "civilians."  See Additional Protocol I, art.

50.1 (defining the term "civilian" to mean "any person who does not belong to one of the

categories of persons referred to in Article 4(A) (1), (2), (3), and (6) of the Third Convention and

in Article 43 of [Additional Protocol I]").  And as civilians, the petitioners would not be subject

to military force "unless and for such time as they [took] a direct part in hostilities."  Id., art.

51.1, 51.3.  In its most restrictive interpretation, this standard would require "a direct causal

relationship between the activity engaged in and the harm done to the enemy at the time and the

place where the activity [took] place."  ICRC Additional Protocols Commentary, supra, at 516.[15]

      But the government no longer seeks to detain the petitioners on the theory that they are

"enemy combatants," and neither Common Article 3, Additional Protocol II, nor the respective

commentaries on these treaties by the International Committee of the Red Cross make any

reference whatsoever to the term "combatant."  "The reason for the absence of combatant status

---

[15]  It is far from clear that the definition of "direct participation" set forth in the commentary to Additional Protocol I is correct.  See Jean-Marie Henckaerts, 87 Int'l Rev. of the Red Cross 175, 190 (March 2005) (noting "the absence of a precise definition of the term 'direct participation in hostilities'" in international and non-international armed conflicts).  Indeed, the petitioners' own expert witness, Gary Solis, advocates an expansive meaning of the term.  In his declaration submitted in support of the petitioners' original memorandum of law, Solis opines that "senior terrorist leaders and terrorist weapons specialists and fabricators should be considered to continually be taking a direct part in hostilities."  Pet'rs' Mem., Ex. 1 (Declaration of Gary D. Solis) ¶ 6(g).  Thus, according to Solis, "Osama bin Laden . . . is continually taking a direct part in hostilities and is always a lawful target, no matter where located, no matter what his activity."  Id.

      Assuming that the Court were inclined to treat individuals fighting on behalf of an enemy organization as civilians as the petitioners request, it would likely conclude that Solis's broad understanding of the term "direct participation," while perhaps not quite broad enough, is a step towards the right answer, at least where non-international armed conflicts are concerned.  The narrower definition espoused in Additional Protocol I makes sense in an international armed conflict, where the sole object of defining "direct participation" is to delineate the circumstances under which one party may detain persons who have no formal or enduring role in the command structure of the parties to the conflict.  Because it is relatively clear in the international armed conflict context which persons may be detained by virtue of their ongoing direct participation in hostilities (i.e., membership in the enemy state's armed forces), it is logical to presume that civilians do not directly participate in hostilities on an ongoing basis—indeed, it is reasonable to presume that they do not participate in hostilities at all.  The onus should therefore rest on the detaining party to establish that the civilian in question has actually directly participated in hostilities.

      But however reasonable this presumption might be in an international armed conflict, it would not make sense in a non-international armed conflict where the members of the enemy organization's armed forces were considered civilians by default precisely because those "civilians" would be as likely as not to engage in direct hostilities at any time depending upon their membership in the armed forces of the enemy organization.  Moreover, defining the term "direct participation" narrowly "would make it virtually impossible for state armed forces to employ force offensively rather than defensively, except when [the enemy fighter] deploy[ed] to directly participate in hostilities."  J.K. Kleffner, From "Belligerents" to "Fighters" and Civilians Directly Participating in Hostilities— on the Principle of Distinction in Non-International Armed Conflicts One Hundred Years After the Second Hague Peace Conference, 54 Netherlands Int'l L. Rev. 315, 332-33 (2007).  Thus, even if the Court were to adopt the "direct participation" model in determining the scope of the President's detention authority in this non-international armed conflict, it would interpret that standard broadly to mean that, consistent with the analysis below, all members of the armed forces of the enemy are directly participating in hostilities at all times for the duration of their membership.

in non-international armed conflicts is obvious: states are not prepared to grant their own citizens, and even less others who might engage in fighting on behalf of a non-state group, the right to do so."  J.K. Kleffner, <u>From "Belligerents" to "Fighters" and Civilians Directly Participating in Hostilities—on the Principle of Distinction in Non-International Armed Conflicts One Hundred Years After the Second Hague Peace Conference</u>, 54 Netherlands Int'l L. Rev. 315, 322 (2007).  Thus, whereas the Geneva Conventions rigorously protect individuals who participate in hostilities in the international context, they are silent with respect to individuals who engage in intranational (or, in this case, transnational) combat.

The petitioners evidently interpret this lack of protection for "combatants" in non-international armed conflicts to mean that every individual associated with the enemy to any degree in such a conflict must be treated as a civilian.  As with Khan's argument regarding the source of the President's ability to detain individuals in armed conflicts in general, this assumption rests on the notion that the Geneva Conventions must specifically enable its signatories to act in a specific manner for a signatory to have the authority necessary to take such action.  <u>See</u> <u>supra</u>, part II.A.  And, as with Khan's prior argument, this notion gets things exactly backwards.  The Geneva Conventions restrict the conduct of the President in armed conflicts; they do not enable it.  And the absence of any language in Common Article 3 and Additional Protocol II regarding prisoners of war or combatants means only that no one fighting on behalf of an enemy force in a non-international armed conflict can lay claim to the protections of such status, not that every signatory to the Geneva Conventions must treat the members of an enemy force in a civil war or transnational conflict as civilians regardless of how important the members in question might be to the command and control of the enemy force or how well organized and coordinated that force might be.

The text of Common Article 3 impliedly supports this conclusion.  The article provides in pertinent part that "[p]ersons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed <u>hors de combat</u> by sickness, wounds, <u>detention</u>, or any other cause" must be treated "humanely."  Third Geneva Convention art. 3(1) (emphasis added).  This restriction on the conduct of the state engaging in a non-international armed conflict carries with it two distinct implications.  The first implication, correctly identified by the government, is that "[S]tates engaged in such conflicts can detain those who are part of [enemy] armed groups."  Gov't's Mem. at 9.  Otherwise, there would be no "[p]ersons . . . placed <u>hors de combat</u> by . . . detention" to treat "humanely."

Second, the fact that "members of armed forces who have laid down their arms and those placed <u>hors de combat</u>" are not "taking [an] active part in the hostilities" necessarily implies that "members of armed forces" who have not surrendered or been incapacitated <u>are</u> "taking [an] active part in the hostilities" simply by virtue of their membership in those armed forces.  And the fact that the category of "[p]ersons taking no active part in the hostilities" only "includ[es]" surrendered or incapacitated members of an armed force necessarily suggests that there is a category of persons in non-international armed conflicts that, by virtue of their lack of membership in the armed forces of the enemy, are not "taking [an] active part in hostilities." This equivalency in treatment reflects the "fundamental principle of the law of war that those who do not participate in the hostilities [should] not be attacked," in which respect "harmless civilians and soldiers <u>hors de combat</u> are <u>a priori</u> on the same footing."  ICRC Additional Protocols Commentary, <u>supra</u>, at 482.

Common Article 3 therefore implicitly bifurcates individuals associated in some sense with the enemy in a non-international armed conflict into two groups: "members of armed

forces" who necessarily always actively participate in hostilities; i.e., would-be combatants, and individuals who are not a part of the enemy's armed forces and therefore do not actively participate in hostilities; i.e., civilians and soldiers rendered hors de combat.  It is not surprising to discover, then, that the International Committee of the Red Cross makes just this sort of distinction in its commentaries to the Third and Fourth Geneva Conventions.  It focuses its commentary on Article 3, sub-paragraph (1) of the Third Geneva Convention on "prisoners of war, who are covered by the Third Convention," ICRC Third Geneva Convention Commentary, supra, at 38, while restricting the focus of its commentary on the identical provision in the Fourth Geneva Convention to "points which more particularly concern persons protected under the Fourth Convention," which governs the treatment of civilians, International Committee of the Red Cross, Commentary on the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, at 38 (Pictet et al. eds., 1958) .

This bifurcation is also apparent in Additional Protocol II.  Part IV of that protocol "is aimed at developing the legal protection to which the civilian population is entitled," ICRC Additional Protocols Commentary, supra, at 1443, and to that end Article 13 of the protocol provides that "[t]he civilian population and individual civilians shall enjoy general protection against the dangers arising from military operations," Additional Protocol II, art. 13.1, and that "[t]he civilian population as such, as well as individual civilians, shall not be the object of attack . . . unless and for such time as they take a direct part in hostilities," id., art. 13.2-13.3.  Of course, it would be odd for the drafters of Additional Protocol II to devote a portion of the convention to protecting a discrete group of individuals labeled "civilians" if every member of the enemy in a non-international armed conflict is a civilian, as the petitioners suggest.  It would also cripple a state's capability to effectively combat the enemy force in a non-international

armed conflict if the members of that enemy force, including those members in a command position, could only be detained whenever there was "a sufficient causal relationship between the [member's] act of participation and its immediate consequences," as the International Committee of the Red Cross defines the term "direct part in hostilities" for purposes of Article 13.3.  ICRC Additional Protocols Commentary, supra, at 1453.  But, lest there be any confusion on the matter, the Committee itself explicitly notes that, unlike civilians, "[t]hose who belong to armed forces or armed groups may be attacked at any time."  Id.

In short, Common Article 3, Additional Protocol II, and the commentaries of the International Committee of the Red Cross all contemplate a division in the treatment of the members of an enemy's "armed forces" and civilians.  Unless they surrender or are incapacitated, members of the enemy's armed forces are always "taking [an] active part in hostilities," Third Geneva Convention, art. 3(1), and therefore "may be attacked" and, incident to that attack, detained "at any time," ICRC Additional Protocols Commentary, supra, at 1453.  "[C]ivilians who do not participate in hostilities," on the other hand, "should be spared" those consequences.  Id. at 1443.

Interpreting Common Article 3 and Additional Protocol II in this manner comports with customary international law.  As the International Committee of the Red Cross noted in its recent study of that body of law, "[s]tate practice establishes" the rule distinguishing civilians from fighters "as a norm of customary international law applicable in both international and non-international armed conflicts."  1 Int'l Comm. of the Red Cross, Customary International Humanitarian Law 3 (Jean-Marie Henckaerts & Louise Doswald-Beck, eds., Cambridge Univ. Press 2005) (the "ICRC Study").  Several states have either explicitly or impliedly required that their armed forces distinguish between fighters and civilians, see id. at 6 (listing states with

military manuals, legislation, or official statements imposing this rule), "to the effect that only

the former may be targeted," id.  And the International Committee of the Red Cross "has called

on parties to both international and non-international armed conflicts to respect the distinction

between [fighters] and civilians." Id. at 8.[16]

      This result is also consonant with the intended purpose of Common Article 3.  While its

scope may encompass the transnational conflict at issue here, the article was drafted "to aid the

victims of civil wars and internal conflicts."  ICRC Third Geneva Convention Commentary,

supra, at 28.  As counsel for the government pointed out at oral argument on this issue,

permitting a State to detain members of the armed forces of a non-state entity in a non-

international armed conflict only when those members directly participated in hostilities, at least

as that term is defined by the petitioners, "would encourage . . . armed groups to try to blend into

the civilian population, which then necessarily subjects the civilian population to increased

danger."  Hr'g Tr. 63:11-14, Mar. 23, 2009.  And the practical absurdity of the petitioners'

approach is evident when one considers the impact such a standard would have had on the "civil

wars and internal conflicts" experienced by this nation in the past.

      The Court therefore rejects the petitioners' argument that the laws of war permit a state to

detain only individuals who "directly participate" in hostilities in non-international armed

conflicts.  Common Article 3 is not a suicide pact; it does not provide a free pass for the

members of an enemy's armed forces to go to and fro as they please so long as, for example,

---

[16]  Throughout its study, the International Committee of the Red Cross distinguishes between "combatants" and civilians rather than "fighters" and civilians, but it clarifies that "[t]he term 'combatant' . . . is used in its generic meaning, indicating persons who do not enjoy the protection against attack accorded to civilians," and not as "imply[ing] a right to combatant status or prisoner-of-war status."  ICRC Study, supra, at 3.  To avoid confusion between the "generic" use of the term "combatant" and the use of the term in Additional Protocol I, the Court has substituted the appellation "fighters" in place of the potentially confusing term "combatant."  At least one commentator has suggested just this approach.  See Kleffner, supra, at 330 (opining that "[o]ne could refer" to members of the enemy armed forces in a non-international armed conflict "as 'fighters' in order to avoid any confusion about their lacking the entitlement to combatant-privilege and prisoner of war status").

shots are not fired, bombs are not exploded, and planes are not hijacked.  Consistent with Common Article 3 and Additional Protocol II, the President may detain anyone who is a member of the "armed forces" of an organization that "he determines planned, authorized, committed, or aided" the 9/11 attacks, as well as any member of the "armed forces" of an organization harboring the members of such an organization.  Pub. L. No. 107-40 § 2(a), 115 Stat. at 224.[17]

As for the criteria used to determine membership in the "armed forces" of the enemy, the Court agrees with the government that the criteria set forth in Article 4 of the Third Geneva Convention and Article 43 of Additional Protocol I should inform the Court's assessment as to whether an individual qualifies as a member of the "armed forces" of an enemy organization like al-Qaeda.  Although these provisions obviously cannot be applied literally to the enemy organizations contemplated in the AUMF—if that were the case, the conflict at hand would not be governed by Common Article 3 in the first place—they may nevertheless serve as templates from which the Court can glean certain characteristics necessary to identify those individuals who comprise an "armed force" for purposes of Common Article 3.  This approach is also consistent with Common Article 3's command that the "[p]arties to the conflict . . . endeavor[r] to bring into force . . . all or part of the other provisions of the [Third Geneva Convention]."[18]

Foremost among these basic distinguishing characteristics of an "armed force" is the notion that the group in question be "organized . . . under a command responsible . . . for the

---

[17]  Because the authority claimed by the President by the AUMF does not run afoul of the laws of war, the Court need not consider whether the AUMF is sufficiently clear to obviate concerns that it has delegated excessive lawmaking power to the President in contravention of the Constitution, or violates any other canon of construction raised by the petitioners.  See Pet'rs' Mem. at 17 (challenging as, inter alia, an unconstitutional delegation of congressional authority any interpretation of the AUMF that would allow "the President to abandon the United States'[s] long-standing commitment to the traditional law[s] of war, or to ignore the country's existing treaty obligations").

[18]  Common Article 3 contemplates that the additional provisions of the Third Geneva Convention be enforced "by means of special agreements" between the parties to the non-international armed conflict.  However, such agreements seem unlikely to occur in the conflict at hand.

conduct of its subordinates," Additional Protocol I, art. 43.1. Although "[t]he term 'organized'

is obviously rather flexible, . . . [a]ll armed forces, groups[,] and units are necessarily structured

and have a hierarchy." ICRC Additional Protocols Commentary, supra, at 512; see also

Kleffner, supra, at 332 ("Members of organi[z]ed armed groups do not act as atomi[z]ed

individuals, but as part of a structured collective whose very purpose it is to use armed force and

inflict death and injury to objects of such an intensity so as to reach the threshold of non-

international armed conflict."). Thus, mere sympathy for or association with an enemy

organization does not render an individual a member of that enemy organization's armed forces.

Instead, the individual must have some sort of "structured" role in the "hierarchy" of the enemy

force.

Obviously, "the 'organizations' that the President is authorized to target under the AUMF

do not . . . issue membership cards or uniforms." Gov't Opp'n at 6. Nevertheless, there is a

distinction to be made between members of a terrorist organization involved in combat

operations and civilians who may have some tangential connections to such organizations. As

Curtis Bradley and Jack Goldsmith note in their lengthy article on the validity of the AUMF and

its implications, "terrorist organizations do have leadership and command structures, however

diffuse, and persons who receive and execute orders within this command structure are

analogous to combatants" in international armed conflicts. Curtis A. Bradley & Jack L.

Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L. Rev. 2048,

2114-15 (May 2005). Thus, under Additional Protocol I, only "persons who receive and execute

orders" from the enemy's "command structure" can be considered members of the enemy's

armed forces. Sympathizers, propagandists, and financiers who have no involvement with this

"command structure," while perhaps members of the enemy organization in an abstract sense,

cannot be considered part of the enemy's "armed forces" and therefore cannot be detained

militarily unless they take a direct part in the hostilities.

At the same time, the armed forces of the enemy consist of more than those individuals

who would qualify as "combatants" in an international armed conflict.  See ICRC Third Geneva

Convention Commentary, supra, at 51.  ("At the Conference on Government Experts, the

question arose as to the advisability of giving a more exact definition of armed forces by

stating . . . that the term covers both combatants and non-combatants.  It was finally considered

that this fact was usually implicit in any general reference to armed forces . . . .");  ICRC

Additional Protocols Commentary, supra, at 510 (noting that under the Hague Regulations that

informed the drafting of Article 4 of the Third Geneva Convention and Article 43 of Additional

Protocol I, "[t]he armed forces of the belligerent parties may consist of both combatants and non-

combatants").  The key question is whether an individual "receive[s] and execute[s] orders" from

the enemy force's combat apparatus, not whether he is an al-Qaeda fighter.  Thus, an al-Qaeda

member tasked with housing, feeding, or transporting al-Qaeda fighters could be detained as part

of the enemy armed forces notwithstanding his lack of involvement in the actual fighting itself,

but an al-Qaeda doctor or cleric, or the father of an al-Qaeda fighter who shelters his son out of

familial loyalty, could not be detained assuming such individuals had no independent role in al-

Qaeda's chain of command.  See Kleffner, supra, at 334 ("[P]ersons who accompany the armed

forces without actually being members thereof should be immune from being made the object of

attack, unless and for such time as they directly participate in hostilities.").[19]

---

[19]  Kleffner argues that "only 'fighters' should be liable to attack for the entire duration of their membership" in the enemy armed forces because "organi[z]ed armed groups may include members devoted to functions other than fighting."  Kleffner, supra, at 333.  The problem with this approach is that many members of the armed forces who, under different circumstances, would be "fighters" may be assigned to non-combat roles at the time of their apprehension.  These individuals are no less a part of the military command structure of the enemy, and may assume (or resume) a combat role at any time because of their integration into that structure.  For example, an al-Qaeda cook (continued . . .)

With these non-exclusive limiting principles in mind, the Court agrees with the government that "[i]t is neither possible nor advisable" to define "the precise nature and degree of 'substantial support,' or the precise characteristics of 'associated forces,' that are or would be sufficient to bring persons and organizations" within the government's proposed standard for detention.  Gov't's Mem. at 2.  As the government  aptly suggests, the exact contours of the standard must and will be fleshed out on a case-by-case basis.  Id.  Certainly, there is no shortage of scenarios arising out of the conflict at hand from which to identify these contours.

But while the precise meaning of the definition for detention now invoked by the government cannot be definitively settled in the abstract, it is not the case that the standard is, as the petitioners' designated lead counsel suggests, "entirely nebulous."  Hr'g Tr. 65:16, Mar. 23, 2009.  For, as counsel for the government conceded at oral argument on this issue, the "substantial support" model advanced by the government is restricted to those individuals that are "effectively part of the [armed] force[s]" of the enemy.  Hr'g Tr. 53:23, Mar. 23, 2009.  And that inquiry must, at a minimum, be made consistent with the limiting principles articulated above.  Any attempt by the government to apply its "substantial support" standard in a manner contradictory to these principles would give rise to the constitutional concerns raised by the petitioners regarding the clarity of the scope of Congress's delegation of authority to the President and, as such, would have to be rejected by the Court.  See supra, n.17.

In other words, the Court interprets the government's "substantial support" standard to mean individuals who were members of the "armed forces" of an enemy organization at the time of their initial detention.  It is not meant to encompass individuals outside the military command structure of an enemy organization, as that term is understood in view of the limiting principles

who has trained at an al-Qaeda camp and sworn allegiance to Osama bin Laden is no less dangerous than his comrade guarding the camp entrance, and must be incapacitated for the same reasons.

set forth above.  With these caveats in play, the Court adopts the government's "substantial"

support" standard for detention in favor of the "direct participation" model advanced by the

petitioners.[20]

### III. Conclusion

At first blush, the refinements made by the government to its suggested standard for

detention appear to be of a minimal if not ephemeral character.  Replacing a standard that

authorizes the detention of individuals who "support" an enemy organization with a standard that

permits the detention of individuals who "substantially support" that enemy doubtless strikes the

casual reader as a distinction of purely metaphysical difference, particularly when the

government declines to provide any definition as to what the qualifier "substantial" means.

Indeed, the Court shares the petitioners' distaste for the government's reliance on the term

"support" at all, laden as it is with references to domestic criminal law rather than the laws of

war that actually restrict the President's discretion in this area.  See Allison M. Danner, Defining

Unlawful Enemy Combatants: A Centripetal Story, 43 Tex. Int'l L.J. 1, 9-10 (Fall 2007) (noting

the heavy reliance of the government's "support" standard for detention "on concepts imported

from domestic criminal law, particularly conspiracy and aiding and abetting").

Nevertheless, the Court is convinced upon closer inspection that the government's

revised standard, as explained by the government in its memorandum of law announcing that

standard and, most especially, during the oral argument held before this Court on March 23,

---

[20]  The Court notes that the government's "substantial support" standard, as limited by the Court's interpretation of that standard set forth above, is not so different from the expansive "direct participation" standard advanced by the petitioners' expert witness.  See supra, n. 15; see also Kleffner, supra, at 333 (recognizing that "[t]o construe membership in an organi[z]ed armed group as permanent direct participation . . . produces the same results" as treating all members of the enemy's armed forces as subject to detention).  The latter approach, however, is "open to the objection that it conflates two conceptually distinct categories of persons—members of armed groups and others who directly participate in hostilities without being members of such groups—under one and the same heading of 'direct participation.'"  Id.

2009, comports with the laws of war as the Court understands them.  The Court will therefore

adopt the government's standard for detention as its own, subject to the interpretation of that

standard provided by the Court above.  However, the Court will strictly adhere to its

interpretation of that standard in considering the specific cases before it, and therefore will not,

in applying that standard on a case-by-case basis, deviate from the limiting principles articulated

above.  With that understanding, the Court concludes as a matter of law that, in addition to the

authority conferred upon him by the plain language of the AUMF, the President has the authority

to detain persons who were part of, or substantially supported, the Taliban or al-Qaeda forces

that are engaged in hostilities against the United States or its coalition partners, provided that the

terms "substantially supported" and "part of" are interpreted to encompass only individuals who

were members of the enemy organization's armed forces, as that term is intended under the laws

of war, at the time of their capture.[21]

       **SO ORDERED** this 22nd day of April, 2009.[22]


                                                 REGGIE B. WALTON
                                               United States District Judge

---

[21]  The government also asserts that the President may detain individuals who substantially support "forces" that are "associated" with the Taliban and al-Qaeda.  Gov't's Mem. at 2.  The meaning of the term "associated forces," and the propriety of detaining members of such forces under the laws of war, were not argued in any detail by the parties and may not concern many of the petitioners with habeas corpus petitions pending before this member of the Court. The issue must therefore await resolution at a later date if that becomes necessary.

[22]  Consistent with the supplemental case management order entered by this Court on February 19, 2009, as amended by the Court on March 27, 2009, the Court will enter an order contemporaneous with this memorandum opinion directing the petitioners to file or renew their motions for expedited judgment, if any they wish to have decided by this Court, within ten days of the entry of the order.